All right, we call our third case in the morning. Guzman v. Hacienda Records. Mr. Showalter, you're up. May it please the court, I'm David Showalter on behalf of Jose Guzman. I have provided to the court two little demonstrative aids that summarize the evidence. Excuse me. Yo tengo en mi poder una carta de amor que te me la mandaste pidiendo compasión. Those are the lyrics to a song, the opening verse, the opening introduction to a song called Triste Aventurera, composed by Jose Guzman, a 92-year-old songwriter now in the final days of his life. He copyrighted that work in 1974. About 14, excuse me, 16 years later, Hacienda Records, under the direction of Mr. Rick Garcia, recorded a song that had those identical lyrics. Those words are the same, but the music isn't. There are some differences in the music. There are a lot of differences. I listened to both of them. Did you? It's like one day. The district court, in his analysis of the music, talked about the issues that Hacienda raised in terms of the differences of the music. The district court, at document 160, pages 7 through 13, talks about his opinion that the songs are substantially similar. He makes that qualitatively important similarities. But has any court ever held that songs are strikingly similar, which I think is the appropriate language, if there's only one verse that's identical, and just the lyrics, not the music? The Silvestre v. Oswald court, which we cite, references, that's an access case. At page 28 of our brief, there's a treatise of Paul Goldstein, a Goldstein on copyright, who also cites to the Helm v. Universal Picture case, where you don't have to have a 300-page novel where the entirety of it is identical, if you have a unique identifying fragment or segment, which we have here. We have a verse, the opening first thing that people hear is unique. Nowhere in the entire universe of music, in any language, do these lyrics appear. It's clear that they are identical, and that that upon which the court... The two lines are identical, but does that make the songs strikingly similar, the whole package? I think it does. And what's your best case for that, the Helm case? The Helm case and the Silvestre case, which says that where you have the access, and we've got another chart on that, and this identical issue. I think the, let's see, Iowa State University Foundation case. Well, you didn't do real well in the access portion, right? So I'm surprised you're relying on access cases. You mean in the courts, the district courts finding? I think we did, because we have another chart that identifies all of the issues of access. We're talking about Corpus Christi. It's a regional Tejano market where there's a finite set of bands and groups and songwriters performing in Corpus Christi, and we're talking about the same time frame. We're talking about radio airplay, clubs, concerts that Rick Garcia admitted he also attended, and he listened to the same two Tejano radio stations. Rick Garcia began his career as a recording engineer at Freddie Records, the other kind of Tejano powerhouse in this limited market of Corpus Christi from about 1976 through 1980. Around 1980, give or take, Mr. Guzman was a songwriter under contract at in the Tejano market. Hacienda holds itself out as an entity that has its finger on the pulse of the Tejano market in Corpus Christi. Obviously, going to the same club and listening to the same radio shows or stations would have had access, and that's really all we have to show is a reasonable possibility of access. But whose access is relevant? Pardon? Whose access is the relevant access? I'm not sure that this has been analyzed in the correct framework. The defendants or the creator of Carta Sumor? It seems that the creator's access is the key access for the purpose of the analysis under the case law, and I'm not sure anyone has focused on that. And I think we've sort of focused on it because we talk about how they've cited a Bernal case, which is completely inapposite to the facts that we have here as one where just a producer couldn't be liable because other people in the organization knew about it. Here, they're saying, well, we're a record label. Some band came in and recorded it. We don't know where the song came from. Record labels, they recorded it. They put it out on their label. They profited from it. They've never paid anybody, and so they're trying to shield themselves from liability because, well, a band recorded it. Rick Garcia is the one who knows about it. There's no intent required. They try to say, well, some songwriter up in Lubbock is the one who gave the song to the band or claimed to have written it. They don't have any evidence that anybody else created it other than the hearsay, basically, of Roman Martinez that somebody else wrote the song. I think if a record label is going to profit from recordings that it puts on its label and sells, they're, at best for them, an innocent infringer. They don't get a free pass just because they say, we've never heard it or I didn't happen to be listening to the radio station at the time it was played. Like other cases, say, in regional markets, I think we cited page 20 of our brief, the Sylvester case, and those are much larger regional markets where, admittedly, the song was played in some local venues and the defendant says, well, we didn't hear it. Still, they had a reasonable opportunity or possibility to hear it. For you to win this case, we have to overturn one of the factual findings of the district court on either access or striking similarity. Is that true? I think so. I think the district court was either clearly erroneous because when you look at all of the factors showing that there was access, he just missed the ball on that point, or he decided that if a defendant can say, well, I didn't hear it, that overrules or trumps the basic test, which is, was there a reasonable possibility of access, or the court should have analyzed it with the sliding scale analysis, which we think should be officially recognized in the Fifth Circuit, where you have a long list of access evidence. Which circuits have expressly rejected the sliding scale, Second and Seventh? Second and the Ninth, I believe. Have expressly rejected? Accepted it. No, Second specifically rejected. The sliding scale? Yes, so I'm asking you, you want us to adopt, you want us to say the district court erred because they didn't adopt this test, but some of the circuits have already expressly rejected the test, do you want us to say the court erred in not adopting? And which ones are those? Maybe it's the Ninth Circuit. The Ninth Circuit has allowed it, but haven't most of the other ones so far that have looked at it rejected it? Well, even the Fifth Circuit, some of the cases have looked at it, the positive black talk case have looked at it, and maybe it's more a helpful analytical tool where you have a number of indicia of access, then you can't have a defendant just say, well, I haven't heard it, I didn't, I don't remember going to that club or listening to the radio at that time. Tell me why it's the case. I mean, going back to a similar question Judge Elrod asked, it just strikes me, you're not arguing that there's any evidence that you have that wasn't put to the district court and in the trial, right? You're not arguing that there's some evidence that's somehow out there that wasn't produced at trial. You spot that all the evidence there is your side was marshaled forward. Is that correct? Yes. All right. So, you also, I assume, would agree a considerable part of this case rests on credibility. Of Garcia and other people, what they heard, when they heard it, what they didn't hear, etc., right? Credibility is important. All right, then. So, tell me how, even assuming some other test, it's necessarily that you could prevail if we still found that the district court's credibility determinations are unassailable, they're not clearly erroneous, and they drive the case. I think your question accurately assumes how the court should look at it, but there's no question that we did have credible evidence that it was. That's not the point. The point is, you've told me there's no evidence hanging out there in the closet that had you known the district court would have ruled against you, you'd have brought that witness. So, that's not here. All the evidence could be produced was put on, right, wrong, or otherwise. District court could have said, I find in favor of the plaintiff, yada, yada, yada. It went through, etc. It didn't. So, we've got a fully tried case before the court. So, I'm saying, even if there were some other tests, because credibility is such a major portion of the assessment of this trial, convince me how you could necessarily prevail just with another test. I know you think the district court got it right, but there's no clear error in those credibility determinations. So, what are you left with? The court basically got the facts right in its opinion. It acknowledges the airplay in the market, the concerts that Rick Garcia went to, the same places that they specialize in this kind of music, the striking similarity of the opening verse. The court acknowledges all those facts as true, but then decides, basically, that the reasonable possibility of access test is not applicable because Rick Garcia said he never heard it. He didn't hear it on the radio on those days. The cases say, when you have those fact findings, we've met our burden of a reasonable possibility of access. Otherwise, you're going to have defendants. So, your answer to me, you want us to reverse them on the facts? Is that the answer you're giving me? Because that's what it sounds like. That is part of what we do want, Your Honor, and to be remanded. But why is it different than the thousands of cases we get, where there's a full jury trial, there's an assessment by a jury or the bench? Three of us might have called it a different way, but if you're not saying there was an error in not letting some evidence in, there's no error in the assessment, there's no evidence hanging out there that the court or the jury has, if they make the column saying, boil down to essential, why is this different than a case if we say there's no error in the facts? I'm just trying to see how you can prevail if you don't get over that hump. I understand about this other test, but it just seems like you've got a big hurdle on the facts. I think he misapplied the law, because there's, apart from them saying we didn't hear it, there's not a whole lot of dispute in the similarities in the song. They disputed, but the court, when he denied their attorney's fees, went through a number of factors at pages 7 through 13, where he enumerates all these similarities. He finds the songs are substantially similar. He finds these different evidences of access, but then says there was no access. It seems like the test that he applied, given the facts that we have, was not correct. But he says that it's substantially similar. He spots you. He says after hearing the facts that it's substantially similar. It's just not strikingly similar. So even if you were to apply that sliding scale test, it's not going to work for you, because it's not strikingly similar, and it's just substantially similar, and there's not really any good evidence of the access. He didn't buy the suppositions you'd have to put on to get that. So there's enough here to see that even if it was sliding scale, that he's not mad. But we have an identical fragment that's highly idiosyncratic. It doesn't appear anywhere else in the universe of music. That, to me, says it's strikingly similar, and that access should be presumed. All right. Thank you, counsel, for your argument and answering our questions. You've reserved your rebuttal time to come back up. All right. Thank you. Mr. Garcia? I'm just thinking the same thing. I will. Mr. Garcia, do you have a disclaimer about any relationship or not with the Hacienda Records? I will acknowledge fully, Your Honor, that Hacienda Records is owned by my father, and that Hacienda Records' vice president is my uncle, Rick Garcia, whose name you heard a few times, who's sitting in the audience here. And I've been the lawyer for Hacienda Records for over 20 years. And my name is Roland Garcia, Jr. I'm here with my co-counsel, Jennifer Thompson, with the Greenberg Chartered Firm representing Hacienda Records, Your Honor. All right. I think the court's questions were right on target, and that is Judge Costa considered all the evidence. It was a bench trial. He issued a reasoned opinion. He judged the credibility of the witnesses. He let the evidence in, and he made the only decision that could be made based on the evidence. That was no access. This case is about as far from access as you could find in any reported decision, and I've cited some of those cases for Your Honors. I looked at this chart that was handed to you. I think if you glean it, you'll notice there's no record citations here because most of this is not in the record and not in the opinion. And I was only handed this right before the door opened, even though I've been here all morning. Guess what? That's when we get it. Our counsel have a pension for putting stuff on the bench just before we get here. But anyway, that's neither here nor there. We didn't see it very much sooner than you did. In the five minutes I've had to quickly go through the record, I will point out, in fairness to Hacienda Records, Your Honor, on this sheet here that if you look at 1, 2, 3, 4, the fifth little bullet point or box, it says, Rick Garcia helps bands who record at Hacienda Records Studios select music to record, etc. Well, there's no evidence that Rick Garcia or anyone at Hacienda Records selected this song to put on the album. That's just not true. In fact, the record on appeal is at page 2965, which makes very clear that it was not Rick Garcia who selected this song. And here's the dilemma that's faced by record labels all the time, Your Honors. This is incredible, is that a band comes in to record. The band comes in, they generally have 10 albums on a CD. They know the songs ahead of time. Hacienda doesn't tell them what songs. They come in with the songs and they can. They've been rehearsing, they're ready to go, they go in, they're efficient with their studio time, they record the 10 songs, and then at the end of the session they tell the studio two things, the name of the song and the name of the songwriter. We need that information to be able to put it on the credits on the CD, and we need the information to do royalty reports and this and that. Well, here's the problem. Sometimes the band knows the name of the song. Sometimes they don't. Sometimes the band knows the name of the song and they don't know who wrote it, because they just pick up songs, they play in clubs over the generations, and many, many songs are not even copyrighted. So the record label does its absolute best to try to determine who owns this song. On this particular case, your honors, what happened was that the band came in, they selected their songs, not Rick Garcia, not Hacienda, they recorded them, they said, this particular song is named Caracas de Amor, and this particular song was written by Mr. Ortiz in Lubbock, and Rick Garcia, who was the engineer on that particular album, he says, okay, he does his due diligence. He checks the U.S. Copyright Office website, and this is in the record, and sure enough, there's a song, Caracas de Amor, by Mr. Ortiz, not by the plaintiff, and second, Mr. Rick Garcia checks with the BMI website. BMI is the industry standard. It's called Broadcast Music Incorporated. This is evidence in the record on this as well, and in fact, you'll see cases, like the Calhoun case, that rely on this. At the end of the day, the question of access is you reach that because there's usually, at that point, there's not evidence, direct evidence, that the record label just copied the song, ripped it off. That's generally not what happens. It's that a songwriter thinks, oh my gosh, I think that's my song I heard on the radio, a line of lyric or a melody or something, and they sue, and so the question becomes, well, Rick Garcia, he's never heard that song, and in fact, there's also, it's not just Rick Garcia who never heard that song, but there was an independent witness who was not the plaintiff and who was not the defendant, but an independent witness, Roman Martinez, who in fact is represented by Mr. Showalter. That's why Mr. Showalter didn't sue him. He was the one, Roman Martinez was with the band Hometown Boys, who recorded Caritas de Amor at the Hacienda studio, so Mr. Roman Martinez gets on the stand, credibly, honestly testifies, I've never heard of Triste Aventurera, the plaintiff's song, and he's been playing in clubs and recording albums for decades. He's never heard of it. Hacienda never heard of the song. Nobody ever heard of the song. If you look at the lyrics to Caritas de Amor, nowhere in there do you see the words Triste Aventurera, so there's no clue to indicate to either the band or anybody who wants to use the song Caritas de Amor to know that maybe part of that song comes from Triste Aventurera. Mr. Garcia, what's the evidence of how in the world it's exact same words to the first line of the song? Is that just a coincidence? Was that your position at trial, or is it someone did pick it up, Mr. Ortiz or somebody over the years? Either Mr. Ortiz tells us, and there's evidence that he told Roman Martinez who testified that Ortiz wrote the song independently. Judge Costa made a finding of independent creation, which is a defense to even if there was access, then if the song was independently created, that's the end of the story. You can have two works of art, they are identical, but if they were independently created, there's no infringement, let alone one line of lyric, which is only eight percent of all the lyrics. Did y'all take the position it was coincidence? Our expert said she called it oral tradition in the Hispanic, Latino, Norteño market, which it was called the Norteño genre. Those songs are passed on generation to generation to generation stories, and in fact, there's a finding by Judge Costa that Mr. Guzman himself was inspired or learned of the song from a friend of his, and who knows where Mr. Ortiz heard or thought of that first line of lyric or whether he created it on his own. There are many songs that have 10, 11, 12 words in sequence, all in the same, and I put that into the brief. Our position is that one line was independently created by Mr. Ortiz, or if he copied it, there's no evidence that he copied it. Certainly, to Your Honor's earlier point, the copier is not Hacienda Records. The copier, if there was a copier, was Mr. Ortiz. He was not sued. He wasn't even deposed by Mr. Showalter. They just go right after the record label. When a composer licenses a song and the U.S. Copyright Office takes it and they issue that registration, excuse me, I meant registration, when you register it, a user has an absolute right to get a license because you have a copyright. Mr. Ortiz has a copyright, not to the one line, but the entire set of lyrics. We had no alternative. When Rick Garcia goes and confirms that that song title and those exact, not one line of lyrics, all the lyrics and the entire melody is identical to Garitas de Amor that's been registered with the U.S. Copyright Office and a copyright issued to Mr. Ortiz, Hacienda had the absolute right to use the song. They obtained a license from the publisher of Mr. Ortiz, and there's a little bullet here that says Hacienda got two licenses and never paid. Well, that's not true. Actually, Hacienda did get two licenses, but they did pay, and that's at the Defendant's Exhibit 63, the Record on Appeal 4741. So that last bullet point right before the red line is another false statement. Let me ask you about the copyright. You said you checked to see if Mr. Ortiz had copyright, or you ran the name of the song, or whatever you did. I thought I heard Counsel for Mr. Guzman said that Mr. Guzman had copyrighted the song. He copyrighted Triste Aventurera. Yeah, with the same words. With the same one line. Pretty close to the same one line. One was plural, one was singular. So that wouldn't have shown up? You don't see that in the U.S. title of the song, and the composer, and originator, and the year, and the registration information. If you order the deposit, you would have, you then see what exactly is that song, lyrics, melody, sound recording, or whatever. But how is a record label to have any clue that when they go, and they pull a license, and they see that Caritas de Amor is registered and owned by Mr. Ortiz, and nowhere is the words Triste Aventurera anywhere, how would they know that well buried in the hundreds of thousands of other songs is a song called Triste Aventurera that has one similar line of lyric? They would never know that. That would be impossible to know. And it's, which, that particular standard, when Mr. Showalter is arguing, well, there should basically be a lesser test for striking similarity based on the one similar line. That is not the law, and that cannot be the law. Striking similarity looks at the totality of the two songs. The look and feel of the two songs. That's the recent U.S. Supreme Court case in Petrella, following the U.S. Supreme Court case in Feist. There's no way around that. You look at the totality of the two songs to see if there's a substantial similarity, striking similarity, and you weigh that. When you get into little components of a song, that only factors into when you get down to what we call probative similarity. In probative similarity, you can look at little one-off components of the song to see if there's signs of similarity, and the reason you can do that is because you don't have exact evidence of copying, and so what you're trying to factual copying element. But again, probative similarity is not striking similarity or substantial similarity. Probative similarity can be like, for example, components that are non-protectable or in the public domain or not unique or not important to the song, but still, there are similarities between the two songs that might lend to an inference of access if you can establish access or evidence of a factual copying. So we would urge, Your Honors, that you should not dilute the strikingly similarity test. That would mean every song that has a melody phrase similar here and there, even if it's non-protectable, even if it's not unique, even if it's not qualitatively or quantitatively important, then there would be an infringement. All songs would be infringing on all of the songs at that point, and that is not the law and should not be the law. One other point I'd like to make, Your Honors, is when we, if you get down to, we talk about step one, which is copyright infringement. Do you own a valid copyright? Did the defendant copy constituent elements that are original? Step two, you get to what I was referring to is the actionable copying. That would mean the factual copying and the substantial similarity. Step three is the factual copying. When you have then, you get into, well, if it's no direct evidence that somebody copied, like for example, Mr. Rick Garcia, there's no direct evidence he knew about Free Stay when he was in high school in another city in South Texas, and Judge Kostov found as much, even before Hacienda existed in 1974-75. Then you would look to probative similarity and access. Then step four is this, Your Honors. You have to determine which act applies. Is it the current 1976 Act, or is it the prior 1909 Act? Here, it's the 1909 Act. That's been lost on everybody. That's important. In the recent famous case where Mr. Farrell Williams and Robin Thicke, remember they brought their suit against Marvin Gaye and all this notoriety, that was a 1909 Act case. That was a pivotal decision in that case because what happened was Marvin Gaye, he had registered his song under the 1909 Act. He registered just the lead sheet, in other words, handwritten melody line with some lyrics. There was no registration of the sound recording. Things like hooks and beats and inflections and instrumentation and background vocals and all that stuff, that was not protected. That was not registered. Here, our position is the only thing that was registered was Mr. Guzman's lead sheet that's in the record, not his sound recording that allegedly was played on the radio. Whatever he registered was not ever played on the radio. We're even more far removed from what could possibly have been fair access, a reasonable opportunity for Mr. Garcia or anyone at Hacienda to have had viewed Triste Aventurera. Now, the other point I want to make is this. Mr. Showalter has this long list of evidence of access. Most of this is unsupported in the record. What he doesn't tell you in here, your honors, is what evidence showed no access. I'll tell you right here. What shows no access is this. Access really is a function of two concepts. It's either a chain of events where, for example, a songwriter will deliver a demo tape to a record studio. That's a chain of events. Or sometimes if there's no direct chain of event, then we call this the wide dissemination theory, in which the song is so popular and so widely heard that it must have been heard by the defendant and must have been copied because of the similarity. Here, what the evidence showed was there are Mr. Guzman testified, oh, my song is very popular, played on the radio all the time. Mr. Garcia testified, I never heard that song on the radio. Now, here's where the objective evidence is, where Judge Costa correctly ruled there was no corroboration of what Mr. Guzman was saying, and here's this, because there are telltale signs of what is popular and what is not popular. One, were there any sales, how many units were sold of the song? Here, zero. Two, did anybody record and release that song? Nobody. Zero. Was it ever on the billboard charts? Here, zero. Did they receive any BMI royalties? If it was played on the radio, radio stations have to pay royalties to BMI, who pays then their clients. Mr. Guzman got zero dollars of royalty, never played on the radio, or at least so little play, no BMI royalties. No sheet music sales for Triste Aventurera. No awards. No radio station rankings at all. All the objective measures was that this song was not popular. It was a complete flop. I'm talking about Triste Aventurera, and so this argument that, oh, it was so widely popular, played in clubs and played in concerts, where are all the BMI royalties? None. Zero. That's why I think the Calhoun case is very good for your honors to consider, because in that Calhoun case, the courts noted that in there, the plaintiff, he recorded an album, it had the song, he released the album, he registered his song with BMI, he performed his song at concerts and churches, he promoted his song to record yet, and that was the plaintiff's testimony, yet the plaintiff only received $11 of BMI royalties, meaning hardly anybody used that song. The court ruled no access, correctly ruled no access. The Intersong case, in which Julio Iglesias was sued, is another very good case, almost on point here, where Julio Iglesias was sued, and CBS also. Again, no access. Even though there was some radio play, you cannot, and it is against the Fifth Circuit precedent, for this court or any court to speculate or conjecture, oh, maybe you did hear it. I'm out of time, and I thank you very much. Sir. All right, Mr. Showalter, we're back to you on rebuttal. It may have been in your brief, but why did it take so long? It's 2015, and the song came out in 1990. Why did it take your client so long to think that there was a cause of action here? He, well, he, why did he not bring suit sooner? I don't know. I think he. He's your client. He is my client. You should know. You didn't ask him? Say, where have you been for the past 25 years? Well, when he contacted us, we looked at it, and we saw that there was a case, and we wanted to try to help him with it. He's never received virtually nothing from anybody in his entire career of writing songs, and we thought it would be appropriate to try to help him with it. He was a songwriter at Freddie Records for about the same time frame that Rick Garcia was an engineer there, and when he asked Freddie Records about, hey, Cartas de Amor, because they put it out on some other records, to say that it didn't make money, it wasn't popular, is just absolutely not correct. Freddie Records recognized that, yes, it is the same song, and paid Mr. Guzman for his song to be straight out in Charrera. Hacienda Records reacted differently, and so the issue that we have is we have this kind of multitude of excuses, and Hacienda wants to turn this test, reasonable possibility of access, they just want to turn it on its head if a defendant's crafty enough to come up with excuses as to why they didn't have access. Or was your client paid BMI royalties? He did not get any, but part of what a record company is supposed to do and publishers are to report what they're doing, and they can either, through their publishing company, register a BMI. Just because royalties weren't paid by BMI or anyone else doesn't mean BMI wasn't picking it up or wasn't paying royalties. BMI, as far as royalties paid on these Tejano songs, which is a minor sub-market, but it was a very intense market in Corpus Christi, just the fact that BMI is not picking up sales for the royalty calculations from this big pool of stuff doesn't mean it's not a popular song. Hacienda doesn't use, doesn't subscribe to SoundScan where you could track what they're selling through barcodes like other... Did you submit any proof of having received royalties to Judge Costa? Our expert witness talked about royalties and damages, and we have evidence of sales of the infringing song which has the identical lyrics. Well, that's not the evidence. Did your client present any evidence, any documentation that he had actually received royalties from anyone? We did not. Hacienda, we've heard this story about, well, the due diligence, they do their investigation, that sort of thing. That kind of conduct was rejected by Judge Costa. Hacienda tried to say, well, we do this research, we find out this information. If you look at Document 129 in that case, Judge Rosenthal found that Hacienda was a willful infringer because their claims of, well, we got a license, or we were going to get around to do a license, or we did our investigation, is not industry standard. It does not excuse infringing. Did you present that to Judge Costa? Pardon? Did you present that to Judge Costa? That ruling by Judge Rosenthal, I believe, came after, yes. We did get into all the same line of inquiry with Judge Costa about when they say, well, we did our due diligence, and we got a license from Harry Fox, for example. What we found out is that they would go to Harry Fox like 15 years after they release an album and try to get a compulsory license on a song that's been previously published. They've never done it. Rick Garcia's done nothing to educate himself about his obligations as a publisher and a record label, and so the practice is, let's just put it out, and we'll sell it, but then later on, we'll come up with reasons why not to get a license. They say, we didn't depose Mr. Ortiz. They tried to call him on a telephone during trial. They didn't depose him either. Anyway, my time is up. I would just ask for the court's consideration of Mr. Guzman's property rights. Thank you. Thank you. Thank you, both counsel.